**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 18 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

U.S. WEST, INC.,

      Petitioner,

    v.

FEDERAL COMMUNICATIONS
COMMISSION, and UNITED STATES OF
AMERICA,

      Respondents,

------------------------------------

AIRTOUCH COMMUNICATIONS, INC.
(AIRTOUCH); SPRINT CORPORATION;
AT&T CORPORATION; SBC
COMMUNICATIONS, INC. (SBC);
SOUTHWESTERN BELL TELEPHONE
COMPANY; PACIFIC BELL; NEVADA BELL;
MCI TELECOMMUNICATIONS
CORPORATION; COMPETITIVE
TELECOMMUNICATIONS ASSOCIATION;
COMPETITION POLICY INSTITUTE;
BELLSOUTH CORPORATION; FRONTIER
CORPORATION,

      Intervenors,

   and

INFORMATION INDUSTRY ASSOCIATION,

      Amicus Curiae.

No. 98-9518

**ON PETITION FOR REVIEW OF AN ORDER
OF THE FEDERAL COMMUNICATIONS COMMISSION
(FCC 98-27)**

---

Laurence H. Tribe, Cambridge, Massachusetts (Jonathan S. Massey, Cambridge, Massachusetts; Dan L. Poole, Robert B. McKenna, and Kathryn Marie Krause, U.S. West, Inc., Washington, D.C.; Charles R. Morgan, M. Robert Sutherland, and A. Kirven Gilbert, III, BellSouth Corp., Atlanta, Georgia; James D. Ellis, Robert M. Lynch, Durward D. Dupre, Michael J. Zpevak, Robert J. Gryzmala, SBC Communications, Inc., Southwestern Bell Telephone Co., Pacific Bell, Nevada Bell, Dallas, Texas, with him on the briefs), appearing for Petitioner and Intervenors BellSouth Corp., SBC Communications, Inc., Southwestern Bell Telephone Co., Pacific Bell and Nevada Bell.

John E. Ingle, Deputy Associate General Counsel, Federal Communications Commission, Washington, D.C. (Christopher J. Wright, General Counsel, and Carl D. Lawson, Counsel, Federal Communications Commission, Washington, D.C., and Frank Hunger, Assistant Attorney General, Mark Stern and Jacob Lewis, Attorneys, United States Department of Justice, Washington, D.C., with him on the brief), appearing for Respondent.

Donald B. Verrilli, Jr., Jenner & Block, Washington, D.C. (Ann M. Kappler, Elizabeth A. Cavanagh, and Elena N. Broder, Jenner & Block, Washington, D.C.; Thomas F. O'Neil, III, Matthew B. Pachman, and Maria L. Woodbridge, MCI Telecommunications, Inc., Washington, D.C.; Genevieve Morelli, Competitive Telecommunications Association, Robert J. Aamoth, Steven A. Augustino, Kelley, Frye & Warren LLP; Jay C. Keithley and Michael B. Fingerhut, Sprint Corp., with him on the brief), appearing for Intervenors MCI Telecommunications, Inc., Sprint Corporation and Competitive Telecommunications Association.

Steven J. Metalitz, Smith & Metalitz, LLP, Washington, D.C., and Charlene B. Flick, Information Industry Association, Washington, D.C., filed an amicus curiae brief on behalf of Information Industry Association.

John D. Windhausen, Jr., General Counsel, Competition Policy Institute, Washington, D.C., Glenn B. Manishin, Kenneth R. Boley, and Elise P.W. Kiely, Blumenfeld & Cohen, Washington, D.C., filed a brief for Intervenor Competition Policy Institute.

---

Before **TACHA**, **EBEL**, and **BRISCOE**, Circuit Judges.

---

**TACHA**, Circuit Judge.

---

Pursuant to 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a), U.S. West, Inc. petitions for review of a Federal Communication Commission ("FCC") order restricting the use and disclosure of and access to customer proprietary network information ("CPNI"). See Second Report and Order and Further Notice of Proposed Rulemaking: In the Matter of Implementation of the Telecommunications Act of 1996; Telecommunications Carriers' Use of Consumer Proprietary Network Information and Other Customer Information; Implementation of Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as Amended, 63 Fed. Reg. 20,326 (1998) ("CPNI Order"). Petitioner argues that the regulations adopted by the CPNI Order constitute an arbitrary and capricious interpretation of the controlling provisions of 47 U.S.C. § 222 and are impermissible because they violate the First and Fifth Amendments of the United States Constitution. The regulations require telecommunications companies, in most instances, to obtain affirmative approval

from a customer before the company can use that customer's CPNI for marketing purposes. We vacate the FCC's CPNI Order, concluding that the FCC failed to adequately consider the constitutional ramifications of the regulations interpreting § 222 and that the regulations violate the First Amendment.

## I. Introduction

This case involves classic issues of separation of powers and the courts' necessary role as guardians of constitutional interests. It is seductive for us to view this as just another case of reviewing agency action. However, this case is a harbinger of difficulties encountered in this age of exploding information, when rights bestowed by the United States Constitution must be guarded as vigilantly as in the days of handbills on public sidewalks. In the name of deference to agency action, important civil liberties, such as the First Amendment's protection of speech, could easily be overlooked. Policing the boundaries among constitutional guarantees, legislative mandates, and administrative interpretation is at the heart of our responsibility. This case highlights the importance of that role.

## II. Background

The dispute in this case involves regulations the FCC promulgated to implement provisions of 47 U.S.C. § 222, which was enacted as part of the Telecommunications Act of 1996. Section 222, entitled "Privacy of customer information," states generally that "[e]very telecommunications carrier has a duty

to protect the confidentiality of proprietary information of, and relating to . . . customers." 47 U.S.C. § 222(a). To effectuate that duty, § 222 places restrictions on the use, disclosure of, and access to certain customer information. At issue here are the FCC's regulations clarifying the privacy requirements for CPNI.[1] The central provision of § 222 dealing with CPNI is § 222(c)(1), which states:

> Except as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer proprietary network information by virtue of its provision

---

[1] The statute recognizes three types of customer information: (1) CPNI; (2) aggregate customer information; and (3) subscriber list information. The statute defines CPNI as:

> (A) information that relates to the quantity, technical configuration, type, destination, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and

> (B) information contained in the bills pertaining to telephone exchange service or telephone tool service received by a customer of a carrier;

> except that such term does not include subscriber list information.

47 U.S.C. § 222(f)(1)(A)-(B). Given the sensitive nature of some CPNI, such as when, where, and to whom a customer places calls, Congress afforded CPNI the highest level of privacy protection under § 222. By way of comparison, aggregate customer information is "collective data that relates to a group or category of services or customers, from which individual customer identities and characteristics have been removed," id. § 222(f)(2), and subscriber list information consists of the type of information normally published in telephone directories, such as names, numbers, addresses and primary advertising classifications, see id. § 222(f)(3). Congress afforded these other types of customer information substantially less privacy protection under § 222. See id. §§ 222(c)(3), (e).

of a telecommunications service shall only use, disclose, or permit access to individually identifiable customer proprietary network information in its provision of (A) the telecommunication service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service, including the publishing of directories.

Section 222(d) provides three additional exceptions to the CPNI privacy requirements. Those exceptions allow a telecommunications carrier to use, disclose or permit access to CPNI:

> (1) to initiate, render, bill, and collect for telecommunications services,
>
> (2) to protect the rights or property of the carrier, or to protect users of those services and other carriers from fraudulent, abusive, or unlawful use of, or subscription to, such services, or
>
> (3) to provide any inbound telemarketing, referral, or administrative services to the customer for the duration of the call, if such call was initiated by the customer and the customer approves of the use of such information to provide such service.

47 U.S.C. § 222(d). Therefore, the essence of the statutory scheme requires a telecommunications carrier to obtain customer approval when it wishes to use, disclose, or permit access to CPNI in a manner not specifically allowed under § 222.

Section 222 is not the first time the government has placed restrictions on telecommunications carriers' use or disclosure of CPNI. Prior to the enactment of § 222, the FCC had imposed CPNI requirements on the enhanced service operations of several major telecommunications carriers. See CPNI Order ¶ 7.

- 6 -

The FCC imposed these CPNI requirements primarily to prevent large carriers from gaining a competitive advantage in the unregulated enhanced services markets through the use of CPNI, thereby protecting smaller carriers. See id. In contrast, Congress made § 222, which is much broader in scope than previous CPNI requirements, applicable to all carriers, not just the dominant ones. This suggests that Congress enacted § 222 for a substantially different purpose than previous FCC CPNI requirements.

Faced with the new CPNI restrictions, various telecommunications companies and trade associations sought FCC guidance regarding their obligations under § 222. See id. ¶ 6 & n.25. These requests, along with a petition for a declaratory ruling regarding the interpretation of the term "telecommunication service" under § 222(c)(1), prompted the FCC to commence a rulemaking on May 17, 1996. See id. ¶ 6; In the Matter of Implementation of the Telecommunications Act of 1996: Telecommunication Carriers' Use of Customer Proprietary Network Information and Other Customer Information, Notice of Proposed Rulemaking, 61 Fed. Reg. 26,483 (1996) ("CPNI NPRM"). The CPNI NPRM sought comment on, among other things: "(1) the scope of the phrase 'telecommunications service,' as it is used in section 222(c)(1) . . . ; (2) the requirements for customer approval; and (3) whether the Commission's existing CPNI requirements should be amended in light of section 222." CPNI Order ¶ 6

(citing CPNI NPRM ¶¶ 20-33, 38-42).  On February 26, 1998, the FCC released

the CPNI Order we now review.  The CPNI Order addresses the meaning and

scope of § 222 and adopts regulations to implement the statute's CPNI

requirements.  See 47 C.F.R. pt. 64, subpt. U (1998).

The regulations adopted by the CPNI Order interpret § 222(c)(1) through a

framework known as the "total service approach."  That approach divides the term

"telecommunications service" into three service categories: (1) local; (2)

interexchange (which includes most long-distance toll service); and (3)

commercial mobile radio service ("CMRS") (which includes mobile or cellular

service).  See 47 C.F.R. § 64.2005(a).  Broadly stated, the regulations permit a

telecommunications carrier to use, disclose, or share CPNI for the purpose of

marketing products within a category of service to customers, provided the

customer already subscribes to that category of service.  See id.  However, the

carrier may not, without customer approval, use, disclose, or permit access to

CPNI for the purpose of marketing categories of service to which the customer

does not already subscribe.  See id. § 64.2005(b).[2]  For example, petitioner could

use CPNI obtained through the provision of local service to market other local

_____

[2] The regulations treat affiliated entities of a carrier as separate for the purposes of use or disclosure.  Thus, the regulations permit unapproved disclosure of CPNI between affiliated entities of a telecommunications carrier only when the carrier provides different categories of service and the customer subscribes to more than one category of service. See id. §§ 64.2005(a)(1)-(2).

service products, but not cellular services. Moreover, if the customer subscribes to both local and long-distance services, petitioner could use the CPNI to market either service and could exchange the CPNI between affiliates that provide such services, but petitioner could still not use the CPNI to market cellular services. In addition, the regulations prevent telecommunications carriers from using, without customer approval, CPNI gained from any of the three categories described above to: (1) market customer premises equipment ("CPE") or information services (such as call answering, voice mail, or Internet access services); (2) identify or track customers that call competitors; and (3) regain the business of customers who have switched to another carrier. See id. § 64.2005(b)(1)-(3). The regulations also set forth some additional narrow exceptions to the CPNI requirements, other than those stated in § 222(d). See id. § 64.2005(c).

The regulations also describe the means by which a carrier must obtain customer approval. Section 222(c)(1) did not elaborate as to what form that approval should take. The FCC decided to require an "opt-in" approach, in which a carrier must obtain prior express approval from a customer through written, oral, or electronic means before using the customer's CPNI. See 47 C.F.R. § 64.2007(b). The government acknowledged that the means of approval could have taken numerous other forms, including an "opt-out" approach, in which approval would be inferred from the customer-carrier relationship unless the

customer specifically requested that his or her CPNI be restricted.

Petitioner challenges the FCC's chosen approval process, claiming it violates the First Amendment by restricting its ability to engage in commercial speech with customers. In addition, petitioner argues that the CPNI regulations raise serious Fifth Amendment Takings Clause concerns because CPNI represents valuable property that belongs to the carriers and the regulations greatly diminish its value. The respondents assert that the FCC's CPNI regulations raise no constitutional concerns, are reasonable, and are entitled to deference under the Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).

### III. Discussion

### A. Standard of Review

Under the Administrative Procedure Act, we review a final FCC order to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "contrary to constitutional right, power, privilege, or immunity," id. § 706(2)(B). See Long v. Board of Governors of the Fed. Reserve Sys., 117 F.3d 1145, 1151 (10th Cir. 1997); City of Albuquerque v. Browner, 97 F.3d 415, 424 (10th Cir. 1996). In addition, when the question before us involves an agency's interpretation of a statute it administers, we utilize the two-step approach announced in Chevron. See, e.g.,

Sierra Club v. EPA, 99 F.3d 1551, 1555 (10th Cir. 1996). When Congress has spoken to the precise question at issue, we must give effect to the express intent of Congress. See Chevron, 467 U.S. at 842-43. However, if the statute is silent or ambiguous, we defer to the agency's interpretation, if it is reasonable. See id. at 843-44. The agency's interpretation of the statute need not be the only reasonable or most reasonable interpretation, see id. at 843 n.11, but an unconstitutional interpretation is not entitled to Chevron deference.

In addition, deference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions. See Rust v. Sullivan, 500 U.S. 173, 190-91 (1991); Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575-76 (1988); Williams v. Babbitt, 115 F.3d 657, 661-62 (9th Cir. 1997), cert. denied sub nom. Kawerak Reindeer Herders Ass'n v. Williams, 118 S. Ct. 1795 (1998); Chamber of Commerce of the United States v. FEC, 69 F.3d 600, 605 (D.C. Cir. 1995); Kohler Co. v. Moen Inc., 12 F.3d 632, 634 n.2 (7th Cir. 1992). When faced with a statutory interpretation that "would raise serious constitutional problems, the [c]ourt[s] will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." DeBartolo Corp., 485 U.S. at 575. We follow this approach because we assume that Congress legislates with constitutional limitations in mind and will speak

clearly when it seeks to test those limitations.  See Rust, 500 U.S. at 191;

DeBartolo Corp., 485 U.S. at 575; Williams, 115 F.3d at 662; International

Union, United Auto., Aerospace & Agric. Implement Worker of Am., UAW v.

OSHA, 938 F.2d 1310, 1317 (D.C. Cir. 1991) ("In effect we require a clear

statement by Congress that it intended to test the constitutional waters.").  The

Williams court aptly explained the doctrine as it applies to agencies:

> [J]ust as we will not infer from an ambiguous statute that Congress
> meant to encroach on constitutional boundaries, we will not presume
> from ambiguous language that Congress intended to authorize an
> agency to do so.  At the core of    DeBartolo  lies the presumption that,
> if Congress means to push the constitutional envelope, it must do so
> explicitly.

Williams, 115 F.3d at 662.

Petitioner raises First and Fifth Amendment challenges to the approval

procedure adopted by the FCC.  The parties agree that Congress did not explicitly

set forth the form of customer approval carriers must obtain.  Therefore, if we

determine that the FCC's customer approval rule presents a serious or grave

constitutional question, we will owe the FCC no deference, even if its CPNI

regulations are otherwise reasonable, and will apply the rule of constitutional

doubt.

## B.  Do the CPNI regulations violate the First Amendment?

Petitioner argues that the CPNI regulations interpreting 47 U.S.C. § 222

violate the First Amendment.  The First Amendment states, "Congress shall make

no law . . . abridging the freedom of speech." U.S. Const. amend. I. Although the text of the First Amendment refers to legislative enactments by Congress, it is actually much broader in scope and encompasses, among other things, regulations promulgated by administrative agencies. See, e.g., Rust, 500 U.S. at 192 (subjecting Department of Health and Human Services regulations limiting the ability of Title X fund recipients to engage in abortion-related activities to review under the First Amendment).

### 1. Do the CPNI regulations restrict speech?

As a threshold requirement for the application of the First Amendment, the government action must abridge or restrict protected speech. The government argues that the FCC's CPNI regulations do not violate or even infringe upon petitioner's First Amendment rights because they only prohibit it from using CPNI to target customers and do not prevent petitioner from communicating with its customers or limit anything that it might say to them. This view is fundamentally flawed. Effective speech has two components: a speaker and an audience. A restriction on either of these components is a restriction on speech. Cf. Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 756-57 (1976) (noting that the First Amendment protects the communication, whether the speech restriction applies to its source or impinges upon the audience's reciprocal right to receive the communication); Martin v.

City of Struthers, 319 U.S. 141, 143 (1943) (noting the First Amendment "embraces the right to distribute literature and necessarily protects the right to receive it"). In other words, a restriction on speech tailored to a particular audience, "targeted speech," cannot be cured simply by the fact that a speaker can speak to a larger indiscriminate audience, "broadcast speech."

Perhaps the Supreme Court case of Florida Bar v. Went For It, Inc., 515 U.S. 618 (1995), best illustrates this. In Went For It, a lawyer referral service and an individual lawyer challenged a Florida Bar rule that prohibited attorneys from using direct mail advertisements to solicit wrongful death and personal injury clients within thirty days of the accident or disaster causing death or injury. See 515 U.S. at 620-21. Despite the fact that the attorney could indiscriminately mail solicitations for his services, the court found that the targeted speech constituted commercial speech and that the restriction on the targeted speech implicated the First Amendment. See id. at 623[3]; see also Ficker v. Curran, 119 F.3d 1150, 1153-56 (4th Cir. 1997) (applying First Amendment analysis to direct mail solicitations by attorneys to criminal and traffic defendants); Revo v. Disciplinary Bd. of the Sup. Ct. for the State of N.M., 106 F.3d 929, 932-33 (10th Cir.) (determining that lawyer's direct mail advertising to personal injury victims and

---

[3] The court did, however, consider this fact in determining whether the speech restriction was narrowly tailored. See id. at 633-34.

family members of wrongful death victims constituted protected commercial speech), cert. denied, 117 S. Ct. 2515 (1997). Therefore, the existence of alternative channels of communication, such as broadcast speech, does not eliminate the fact that the CPNI regulations restrict speech.

## 2. What kind of speech is restricted?

Because petitioner's targeted speech to its customers is for the purpose of soliciting those customers to purchase more or different telecommunications services, it "does no more than propose a commercial transaction," Virginia State Bd. of Pharmacy, 425 U.S. at 762 (quoting Pittsburgh Press Co. v. Human Relations Comm'n, 413 U.S. 376, 385 (1973)). Consequently, the targeted speech in this case fits soundly within the definition of commercial speech. See id.; Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66 (1983); Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d 959, 970 (10th Cir. 1996); see also, e.g., Bad Frog Brewery, Inc. v. New York State Liquor Auth., 134 F.3d 87, 97 (2d Cir. 1998) ("The 'core notion' of commercial speech includes speech which does no more than propose a commercial transaction." (internal quotation marks and citation omitted)). It is well established that nonmisleading commercial speech regarding a lawful activity is a form of protected speech under the First Amendment, although it is generally afforded less protection than noncommercial speech. See, e.g., Went For It, 515 U.S. at 623; Central Hudson

Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y., 447 U.S. 557, 562-63 (1980).

The parties do not dispute that the commercial speech based on CPNI is truthful and nonmisleading. Therefore, the CPNI regulations implicate the First Amendment by restricting protected commercial speech.[4]

### 3. **Central Hudson** analysis

---

[4] Petitioner argues that because the CPNI regulations also burden its internal business communications (e.g., communications between its affiliates, divisions, and employees), we should subject the regulations to the more stringent level of First Amendment scrutiny applied to restrictions on noncommercial speech. Without deciding whether the incidental burden on internal business communications necessarily implicates the First Amendment or whether petitioner has standing to assert such an argument, we find that, in this case, the intra-carrier speech is properly categorized as commercial speech and consequently its existence does not impact our analysis.

Petitioner asserts that the intra-carrier speech does not directly propose a commercial transaction to customers and therefore falls outside the definition of commercial speech. We disagree. Although speech that merely proposes a commercial transaction is at the "core" of commercial speech, it does not constitute the universe of commercial speech. Indeed, the Supreme Court has defined commercial speech in broader terms as "expression related solely to the economic interests of the speaker and its audience." Central Hudson, 447 U.S. at 561. It is, admittedly, unclear to what extent Central Hudson broadened the definition of commercial speech. As another circuit recently stated, "the Court has not offered any nuanced distinctions between the two standards [, i.e., the Virginia Pharmacy and Central Hudson definitions], and the Court noted in Discovery Network that it had not utilized the broader test in its recent commercial speech cases." Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n, 149 F.3d 679, 685 (7th Cir. 1998) (citing City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 422 (1993)). Consequently, we are hesitant to broadly expand the definition of commercial speech. However, in this case, when the sole purpose of the intra-carrier speech based on CPNI is to facilitate the marketing of telecommunications services to individual customers, we find the speech integral to and inseparable from the ultimate commercial solicitation. Therefore, the speech is properly categorized as commercial speech.

- 16 -

We analyze whether a government restriction on commercial speech violates the First Amendment under the four-part framework set forth in Central Hudson. First, we must conduct a threshold inquiry regarding whether the commercial speech concerns lawful activity and is not misleading. See Central Hudson, 447 U.S. at 566. If these requirements are not met, the government may freely regulate the speech. See Went For It, 515 U.S. at 623-24; Revo, 106 F.3d at 932. If this threshold requirement is met, the government may restrict the speech only if it proves: "(1) it has a substantial state interest in regulating the speech, (2) the regulation directly and materially advances that interest, and (3) the regulation is no more extensive than necessary to serve the interest." Revo, 106 F.3d at 932 (citing Central Hudson, 447 U.S. at 564-65).[5] As noted above, no

_____

[5] In 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484 (1996), the Supreme Court established a slight modification to the Central Hudson framework by giving force to a footnote contained in Central Hudson. Justice Stevens, writing for a four Justice plurality, stated that when a regulation constitutes a blanket prohibition against truthful, nonmisleading speech about a lawful product and the ban serves an interest unrelated to consumer protection, it will be subject to a heightened form of First Amendment scrutiny akin to strict scrutiny. See id. at 504 (opinion of Stevens, J.) (citing Central Hudson, 447 U.S. at 566 n.9). Under such circumstances, we must review the regulation under Central Hudson with "special care, mindful that speech prohibitions of this type rarely survive constitutional review." Id. (opinion of Stevens, J.) (internal quotation marks and citation omitted). Although only four Justices subscribed to this view, given Justice Thomas' concurrence in which he stated that he would abandon Central Hudson altogether and apply traditional strict scrutiny under similar circumstances, see id. at 518 (Thomas, J., concurring), it is the narrowest majority holding, and we are bound by it.

In this case, however, the regulation at issue does not constitute a blanket prohibition of speech. Indeed, the telecommunications carriers may utilize a multitude of

one disputes that the commercial speech based on CPNI is truthful and nonmisleading. We therefore proceed directly to whether the government has satisfied its burden under the remaining three prongs of the Central Hudson test.

**a. Does the government have a substantial state interest in regulating speech involving CPNI?**

The respondents argue that the FCC's CPNI regulations advance two substantial state interests: protecting customer privacy and promoting competition. While, in the abstract, these may constitute legitimate and substantial interests, we have concerns about the proffered justifications in the context of this case.

Privacy considerations of some sort clearly drove the enactment of § 222. The concept of privacy, though, is multi-faceted. Indeed, one can apply the moniker of a privacy interest to several understandings of privacy, such as the right to have sufficient moral freedom to exercise full individual autonomy, the right of an individual to define who he or she is by controlling access to information about him or herself, and the right of an individual to solitude, secrecy, and anonymity.[6] See Fred H. Cate, Privacy in the Information Age 19-

communication channels to say whatever they want to their customers. They simply cannot use CPNI to target customers for marketing efforts. Thus, the CPNI regulations are not subject to heightened scrutiny under 44 Liquormart.

[6] We emphasize that the privacy interest in this case is distinct and different from the more limited notion of a constitutional right to privacy which is addressed in cases

22 (1997); Joseph I. Rosenbaum, Privacy on the Internet: Whose Information Is It Anyway?, 38 Jurimetrics J. 565, 566-67 (1998). The breadth of the concept of privacy requires us to pay particular attention to attempts by the government to assert privacy as a substantial state interest.

When faced with a constitutional challenge, the government bears the responsibility of building a record adequate to clearly articulate and justify the state interest. "[T]he Central Hudson standard does not permit us to supplant the precise interests put forward by the State with other suppositions." Edenfield v. Fane, 507 U.S. 761, 768 (1993). Although we agree that privacy may rise to the level of a substantial state interest, see, e.g., Went For It, 515 U.S. at 625 ("Our precedents leave no room for doubt that 'the protection of potential clients' privacy is a substantial state interest'" (quoting Edenfield, 507 U.S. at 769)), the government cannot satisfy the second prong of the Central Hudson test by merely asserting a broad interest in privacy. It must specify the particular notion of privacy and interest served. Moreover, privacy is not an absolute good because it

---

such as Griswold v. Connecticut, 381 U.S. 479, 484-86 (1965), and Roe v. Wade, 410 U.S. 113, 152-56 (1973) (stating that the constitutional right to privacy covers only personal rights deemed "fundamental" or "implicit in the concept of ordered liberty" (internal quotation marks and citations omitted)). Here, the question is solely whether privacy can constitute a substantial state interest under Central Hudson, not whether the FCC regulations impinge upon an individual's right to privacy under the Constitution.

imposes real costs on society.[7]  Therefore, the specific privacy interest must be substantial, demonstrating that the state has considered the proper balancing of the benefits and harms of privacy.  In sum, privacy may only constitute a substantial state interest if the government specifically articulates and properly justifies it.

In the context of a speech restriction imposed to protect privacy by keeping certain information confidential, the government must show that the dissemination of the information desired to be kept private would inflict specific and significant harm on individuals, such as undue embarrassment or ridicule, intimidation or harassment, or misappropriation of sensitive personal information for the purposes of assuming another's identity.  Although we may feel uncomfortable knowing that our personal information is circulating in the world,

---

[7] Professor Cate lists a number of costs privacy imposes.  For example, privacy "facilitates the dissemination of false information," by making it more difficult for individuals and institutions to discover falsities.  Cate, supra, at 28.  Privacy also "protects the withholding of relevant true information," such as when an employee fails to disclose a medical condition that would affect his or her job performance.  Id.  In addition, privacy interferes with the collection, organization, and storage of information which can assist businesses in making rapid, informed decisions and efficiently marketing their products or services.  In this sense, privacy may lead to reduced productivity and higher prices for those products or services.  See id. at 28-29.  Privacy may even threaten physical safety by interfering with the public's ability to access information needed to protect themselves, such as whether an individual has a history of child abuse or molestation, sexual offenses, or communicable diseases.  See id. at 29.  Finally, privacy impedes upon individual voyeuristic curiosity which "opens people's eyes to opportunities and dangers."  Id. at 29-30.

we live in an open society where information may usually pass freely. A general level of discomfort from knowing that people can readily access information about us does not necessarily rise to the level of a substantial state interest under Central Hudson for it is not based on an identified harm.

Neither Congress nor the FCC explicitly stated what "privacy" harm § 222 seeks to protect against. The CPNI Order notes that "CPNI includes information that is extremely personal to customers . . . such as to whom, where, and when a customer places a call, as well as the types of service offerings to which the customer subscribes," CPNI Order at ¶ 2, and it summarily finds "call destinations and other details about a call . . . may be equally or more sensitive [than the content of the calls]," id. at ¶ 94. The government never states it directly, but we infer from this thin justification that disclosure of CPNI information could prove embarrassing to some and that the government seeks to combat this potential harm.

We have some doubts about whether this interest, as presented, rises to the level of "substantial." We would prefer to see a more empirical explanation and justification for the government's asserted interest. Cf. Went For It, 515 U.S. at 630 (describing the record provided by the Bar cataloguing citizen outrage at being solicited just after injury or family tragedy). In addition, the authority relied upon by the government, Edenfield v. Fane, recognizes a state's interest in

protecting against unwanted intrusions caused by solicitations, see 507 U.S. at

769; see also Went For It, 515 U.S. at 625, but it says nothing about the

disclosure of allegedly sensitive information.  On the other hand, we recognize

the government may have a legitimate interest in helping protect certain

information.  Cf. Lanphere & Urbaniak v. Colorado, 21 F.3d 1508, 1514 (10th

Cir. 1994) (finding a substantial state interest in the need to protect the privacy of

those charged with traffic offenses and DUI against dissemination of charging

information for commercial purposes).  Therefore, notwithstanding our

reservations, we assume for the sake of this appeal that the government has

asserted a substantial state interest in protecting people from the disclosure of

sensitive and potentially embarrassing personal information.[8]

---

[8] In its brief and at oral argument, the FCC intimated that consumer privacy concerns might also encompass an interest in preventing the customer intrusion that accompanies broad use of CPNI for telemarketing purposes.  However, this particular privacy justification is lacking from the FCC record.  In fact, the only reference to marketing intrusion into customer privacy comes in paragraph 100 of the CPNI Order in response to U.S. West's attempts to explain why it had such difficulty obtaining authorization to use CPNI in a telemarketing and direct-mail study it conducted.  In paragraph 100, the FCC stated:

> [E]ven if U S WEST is correct, and customers do not grant approval simply because they do not want to be marketed to, this finding would not support permitting notice and opt-out.  Indeed, it would suggest, as MCI observes, that contrary to U S WEST's claim, customers do not want to hear about "expanding service offerings," and in particular do not want their CPNI used towards that end.

CPNI Order ¶ 100.  Such a terse statement, made only in the limited context of refuting U.S. West's expansive reading of its prior market study, provides insufficient evidence that the FCC sought to promote customer privacy by limiting intrusion into customer households through telemarketing made possible by CPNI sharing.

We harbor different reservations about the government's asserted interest in competition. While we afford agencies broad deference in interpreting a statute they are charged to administer, they must obey the dictates of Congress and administer the statute true to Congress' intent. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 213-14 (1976). We are not satisfied that the interest in promoting competition was a significant consideration in the enactment of § 222.

While the broad purpose of the Telecommunications Act of 1996 is to foster increased competition in the telecommunications industry,[9] the language of § 222 reveals no such concern.[10] Rather, the specific and dominant purpose of § 222 is the protection of customer privacy. Indeed, the FCC and members of Congress characterize § 222 as "striv[ing] to *balance* both the competitive and consumer privacy interests with respect to CPNI," Joint Statement of Managers,

---

[9] The preamble to the Act states: "An act to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Pub. L. No. 104-104, 110 Stat. 56, 56 (1996).

[10] While the broad purposes of an Act frequently provide useful insight into the purposes served by a narrow provision of the Act, blind adherence to broad purposes can obfuscate Congress' true intent regarding a particular provision, particularly when that provision has an unambiguous, specific, and dominant purpose. See Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp., 474 U.S. 361, 373-74 (1986) ("Application of 'broad purposes' of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action. . . . Invocation of the 'plain purpose' of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.").

S. Conf. Rep. No. 104-230, at 205 (1996) (emphasis added), which suggests that §

222's purpose in fostering privacy may even run counter to the broad pro-

competition purpose of the Telecommunications Act. In any event, three other

considerations persuade us that Congress did not intend for competition to be a

significant purpose of § 222. First, and most important, the plain language of the

section deals almost exclusively with privacy. Section 222 is entitled "Privacy of

customer information" and is replete with references to privacy and

confidentiality of customer information. In contrast, § 222 contains no explicit

mention of competition. Although § 222(c)(3) and § 222(e) impose

nondiscrimination requirements with respect to disclosure of aggregate customer

and subscriber list information which could be construed as pro-competition

measures, we find that these do not sufficiently indicate that increasing

competition was a purpose of § 222. Moreover, the provisions of § 222 relating

to CPNI which the challenged regulations interpret contain no reference to

nondiscrimination requirements and reflect solely a concern for customer privacy.

See 47 U.S.C. § 222(c)(1)-(2), (d). Second, § 222 differs from previous CPNI

restrictions designed to foster competition because it applies to all

telecommunications carriers, not just the dominant ones. This indicates a

different purpose for the new restriction. Finally, § 222 contains measures that

will allow full use, disclosure, and access to CPNI if customer approval is

obtained. Assuming that a carrier is able to obtain a high rate of customer approval, the alleged competitive effect of § 222's CPNI restrictions is minimal and can perhaps even be nullified. Consequently, we find that Congress' primary purpose in enacting § 222 was concern for customer privacy, not the broader purpose of increasing competition.

Even though we conclude that competition did not constitute the primary purpose of the section, we recognize that Congress may not have completely ignored competition in drafting § 222. While we believe that the asserted interest in increasing competition would not suffice, by itself, to justify the FCC's rule, we will, in this case, consider it in concert with the government's interest in protecting consumer privacy.

**b. Does the Regulation Directly and Materially Advance the State's Interests?**

Under the next prong of <u>Central Hudson</u>, the government must "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." <u>Edenfield v. Fane</u>, 507 U.S. 761, 771 (1993); <u>accord</u> <u>Rubin v. Coors Brewing Co.</u>, 514 U.S. 476, 487 (1995). "This burden is not satisfied by mere speculation or conjecture." <u>Edenfield</u>, 507 U.S. at 770. On the record before us, the government fails to meet its burden.

The government presents no evidence showing the harm to either privacy or

competition is real. Instead, the government relies on speculation that harm to privacy and competition for new services will result if carriers use CPNI. In Edenfield, the Supreme Court struck down a Florida ban on CPA in-person solicitation because the state had presented no evidence -- anecdotal or empirical -- that such solicitation created the dangers of "fraud, overreaching, or compromised independence" that the state sought to combat. See 507 U.S. at 771; cf. Florida Bar v. Went For It, Inc., 515 U.S. 618, 626-27 (1995) (upholding restriction on solicitation of accident victims within thirty days of accident, based on two-year study and written report analyzing statistically and anecdotally the impacts of such solicitation). The FCC faces the same problem here. While protecting against disclosure of sensitive and potentially embarrassing personal information may be important in the abstract, we have no indication of how it may occur in reality with respect to CPNI. Indeed, we do not even have indication that the disclosure might actually occur. The government presents no evidence regarding how and to whom carriers would disclose CPNI. By its own admission, the government is not concerned about the disclosure of CPNI within a firm. See CPNI Order at ¶ 55, n.203 ("[W]e agree . . . that sharing of CPNI within one integrated firm does not raise significant privacy concerns because customers would not be concerned with having their CPNI disclosed within a firm in order to receive increased competitive offerings."). Yet the government has not

explained how or why a carrier would disclose CPNI to outside parties, especially when the government claims CPNI is information that would give one firm a competitive advantage over another. This leaves us unsure exactly who would potentially receive the sensitive information.

Similarly, the FCC can theorize that allowing existing carriers to market new services with CPNI will impede competition for those services, but it provides no analysis of how or if this might actually occur. Beyond its own speculation, the best the government can offer is that "[t]he vigor of US West's protests against the rules . . . indicates that US West also believes that this restriction will be effective in promoting Congress's competitive interest." Appellees Br. at 30. This is simply additional conjecture, and it is inadequate to justify restrictions under the First Amendment. See Edenfield, 507 U.S. at 770-71.

### c. Are the CPNI regulations narrowly tailored?

Even assuming, arguendo, that the state interests in privacy and competition are substantial and that the regulations directly and materially advance those interests, we do not find, on this record, the FCC rules regarding customer approval properly tailored. The CPNI regulations must be "no more extensive than necessary to serve [the stated] interest[s]." Rubin, 514 U.S. at 486. In order for a regulation to satisfy this final Central Hudson prong, there must be a fit

between the legislature's means and its desired objective – "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." Board of Trustees of the State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989) (internal quotation marks omitted). While clearly the government need not employ the least restrictive means to accomplish its goal, it must utilize a means that is "narrowly tailored" to its desired objective. Id.; Florida Bar v. Went For It, Inc., 515 U.S. 618, 632 (1995). Narrow tailoring means that the government's speech restriction must signify a "carefu[l] calculat[ion of] the costs and benefits associated with the burden on speech imposed by its prohibition." Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 417 (1993) (internal quotation marks omitted). "The availability of less burdensome alternatives to reach the stated goal signals that the fit between the legislature's ends and the means chosen to accomplish those ends may be too imprecise to withstand First Amendment scrutiny." 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 529 (1996) (O'Connor, J., concurring); see also, e.g., Went For It, 517 U.S. at 632; Rubin, 514 U.S. at 490-91; Discovery Network, 507 U.S. at 417 n.13. This is particularly true when such alternatives are obvious and restrict substantially less

speech.[11] See Fox, 492 U.S. at 479 ("[A]lmost all of the restrictions disallowed under Central Hudson's fourth prong have been substantially excessive, disregarding 'far less restrictive and more precise means.'" (quoting Shapero v. Kentucky Bar Ass'n, 486 U.S. 466, 476 (1988))).

It is difficult, if not impossible, for us to conduct a full and proper narrow tailoring analysis, given the deficiencies that we have already encountered with respect to the previous portions of the Central Hudson test. Nevertheless, on this record, the FCC's failure to adequately consider an obvious and substantially less restrictive alternative, an opt-out strategy, indicates that it did not narrowly tailor the CPNI regulations regarding customer approval. The respondents argue that the record contains adequate support that the CPNI regulations are narrowly tailored because a study conducted by petitioner U.S. West shows that a majority of individuals, when affirmatively asked for approval to use CPNI, refused to grant it. The U.S. West study shows that 33% of those called refused to grant approval to use their CPNI, 28% granted such approval, and 39% either hung up

_____

[11] While this pronouncement, in effect, imposes a burden on the government to consider certain less restrictive means -- those that are obvious and restrict substantially less speech -- it does not amount to a least restrictive means test. We do not require the government to consider every conceivable means that may restrict less speech and strike down regulations when *any* less restrictive means would sufficiently serve the state interest. We merely recognize the reality that the existence of an obvious and substantially less restrictive means for advancing the desired government objective indicates a lack of narrow tailoring.

or asked not to be called again.  See CPNI Order ¶ 99 n.380.  Additionally, U.S. West secured a 72% affirmative response rate from customers whom it solicited after they initiated contact with the company for some other reason.[12]  See id. ¶ 99 n.378.  This study does not provide sufficient evidence that customers do not want carriers to use their CPNI.  The results may simply reflect that a substantial number of individuals are ambivalent or disinterested in the privacy of their CPNI or that consumers are averse to marketing generally.  The FCC stated that the study supported "an equally plausible interpretation . . . that many customers value the privacy of their personal information and do not want it shared for purposes beyond the existing service relationship."  CPNI Order ¶ 100.  We are not convinced that the study supports the FCC's interpretation, and the FCC provides no additional evidence to bolster its argument.

Even assuming that telecommunications customers value the privacy of CPNI, the FCC record does not adequately show that an opt-out strategy would not sufficiently protect customer privacy.  The respondents merely speculate that there are a substantial number of individuals who feel strongly about their privacy, yet would not bother to opt-out if given notice and the opportunity to do so.  Such speculation hardly reflects the careful calculation of costs and benefits

---

[12] U.S. West also solicited approval from customers by mail.  Only six to eleven percent of residential customers and only five to nine percent of business customers responded to the direct mail trial.  See CPNI Order ¶ 99 n.378.

that our commercial speech jurisprudence requires.

Finally, respondents assert that under FCC v. National Citizens Comm. for Broad., 436 U.S. 775 (1978), the FCC can rely upon its common sense judgment based on experience, notwithstanding the inclusiveness of the rulemaking record. We refuse to extend the rule announced in National Citizens in the manner respondents suggest. National Citizens involved agency conclusions regarding "elusive concepts, not easily defined let alone measured without making qualitative judgments," id. at 796-97 (internal quotation marks omitted), and information that was difficult to compile. We see no such problems in this case. Furthermore, in National Citizens, the FCC's common sense judgment only supported a finding that it "acted rationally" in promulgating a rule. Id. at 796. The burden under the fourth prong of Central Hudson is significantly higher. The FCC must not only demonstrate that it acted rationally, but that it narrowly tailored its regulations to meet its stated goals.

In sum, even assuming that respondents met the prior two prongs of Central Hudson, we conclude that based on the record before us, the agency has failed to satisfy its burden of showing that the customer approval regulations restrict no more speech than necessary to serve the asserted state interests.[13] Consequently,

---

[13] We reiterate that even if the opt-in approach is narrowly tailored with respect to protecting competition, the interest advanced in protecting competition here is insufficient by itself to justify the CPNI regulations under the Central Hudson test. See supra Part

we find that the CPNI regulations interpreting the customer approval requirement of 47 U.S.C. § 222(c) violate the First Amendment.[14]

## IV. Conclusion

The FCC failed to adequately consider the constitutional implications of its CPNI regulations. Even if we accept the government's proffered interests and assume those interests are substantial, the FCC still insufficiently justified its choice to adopt an opt-in regime. Consequently, its CPNI regulations must fall under the First Amendment. At the very least, the foregoing analysis shows that the CPNI regulations clearly raise a serious constitutional question, invoking the rule of constitutional doubt. Accordingly, we VACATE the FCC's CPNI Order and the regulations adopted therein.[15]

---

III.B.3.a.

[14] Because we vacate the CPNI restrictions on First Amendment grounds, we need not address whether they have effected a "taking" under the Fifth Amendment or whether they are otherwise arbitrary and capricious.

[15] The dissent accuses us of "advocating" an opt-out approach. We do not "advocate" any specific approach. We merely find fault in the FCC's inadequate consideration of the approval mechanism alternatives in light of the First Amendment.

No. 98-9518, <u>U.S. West v. FCC</u>

**BRISCOE**, Circuit Judge, dissenting:

I respectfully dissent.  When properly considered, neither of the constitutional challenges asserted by US West warrants setting aside the FCC's CPNI Order, which I believe represents a reasonable interpretation of 47 U.S.C. § 222.  I would therefore deny the petition for review and affirm the CPNI Order.

I.

Before addressing US West's challenges to the CPNI Order, I begin by briefly recounting how this dispute arose.  In 1996, Congress decided to place restrictions on the use of CPNI collected by telecommunications carriers.  In particular, Congress chose to require carriers to obtain customer approval prior to using, disclosing, or allowing access to individually identifiable CPNI.  <u>See</u> 47 U.S.C. § 222.  Following enactment of § 222, the FCC received several informal requests from members of the telecommunications industry for guidance in interpreting the statute's customer approval requirement.  The FCC responded by issuing a Notice of Proposed Rulemaking "tentatively conclud[ing] . . . that regulations interpreting and specifying in greater detail a carrier's obligations under section 222 would be in the public interest," and seeking public comment on various aspects of § 222, including the statute's customer approval requirement.  CPNI Order, at 12.

On February 26, 1998, the FCC issued its CPNI Order interpreting § 222's

customer approval requirements. In pertinent part, the FCC concluded § 222 was ambiguous in that it did "not specify what kind of approval [wa]s required" to be obtained by a carrier prior to use of individually identifiable CPNI. Id. at 67. In resolving this ambiguity, the FCC noted that interested parties (including US West) had "offer[ed] three separate views, ranging from a most restrictive interpretation that would require approval to be in writing, to a permissive one, where carriers merely would need to provide customers with a notice of their intent to use CPNI, and a mechanism for customers to 'opt-out' from this proposed use (notice and opt-out)." Id. After weighing these proffered options, the FCC adopted an "opt-in" approach whereby carriers must "give customers explicit notice of their CPNI rights prior to any solicitation for approval," and then must obtain from the customer "express written, oral, or electronic approval for CPNI uses." Id. at 68.

Dissatisfied with the FCC's selection of the "opt-in" approach, rather than its suggested opt-out approach (which is allegedly cheaper and results in a higher "approval" rate than the opt-in approach), US West filed this action challenging the validity of the FCC's CPNI Order. In particular, US West contends the portion of the CPNI Order interpreting § 222's approval requirement violates the

First and Fifth Amendments of the United States Constitution.[1]  US West also contends that portion of the CPNI Order is "a gratuitously severe construction" of § 222.

## II.

"United States Courts of Appeals have been granted exclusive statutory jurisdiction to review the FCC's final orders pursuant to 28 U.S.C. § 2342(1) (1994) and 47 U.S.C. § 402(a) (1994)."  Iowa Utilities Bd. v. FCC, 120 F.3d 753, 793 (8th Cir. 1997), aff'd in part and rev'd in part, 118 S.Ct. 879 (1998).  In reviewing the CPNI Order at issue in this case, which represents the FCC's construction of a statute it is charged with administering, we are initially "confronted with two questions."  Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1984).  "First, always, is the question whether Congress has directly spoken to the precise question at issue."  Id.  "If the intent of Congress is clear, that is the end of the matter; for [we], as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Id. at 842-43.  "If, however, [we] determine[] Congress has not directly addressed the precise question at issue, [we] do[] not simply impose [our] own construction

_____

[1] This litigation strategy is apparently not unique to this case.  In another case filed in this circuit involving substantially different facts, US West asserted strikingly similar constitutional arguments.  See U.S. West, Inc. v. Tristani, 1999 WL 462446 (10th Cir. July 8, 1999) (asserting First and Fifth Amendment challenges to rate order of the New Mexico State Corporation Commission).

on the statute." Id. at 843. "Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for [us] is whether the agency's answer is based on a permissible construction of the statute." Id.

In my view, § 222, in particular subsection (c)(1), is unambiguous in the sense that Congress made it abundantly clear it intended for telecommunications carriers to obtain customer "approval" prior to using, disclosing, or permitting access to individually identifiable CPNI. Although Congress did not specifically define the term "approval" in the statute, its ordinary and natural meaning clearly "implies knowledge and exercise of discretion after knowledge." Black's Law Dictionary at 102 (6th ed. 1990); see United States v. Roberts, 88 F.3d 872, 877 (10th Cir. 1996) (if Congress does not define statutory term, "its common and ordinary usage may be obtained by reference to a dictionary"); United States v. Floyd, 81 F.3d 1517, 1523 (10th Cir. 1996) ("In interpreting Congressional intent, a reviewing court must determine whether the language used in a statute is ambiguous, or whether it has an ordinary meaning."). In other words, it is clear from the statute that Congress intended for customers to make an informed decision as to whether they would allow their individually identifiable CPNI to be used.[2]

---

[2] US West does not deny that the statute requires it to obtain informed consent from each of its customers regarding their individually identifiable CPNI.

The remaining issue is whether the statute indicates the precise method a carrier must use to obtain customer approval. On this point, I agree with the FCC that the statute is ambiguous. See CPNI Order at 70. Although it is clear from the statute that a customer must be made aware of his or her rights regarding CPNI and be allowed to make an informed decision regarding its use, the statute is silent with respect to precisely how a carrier must obtain this approval from its customers. The question therefore becomes whether the FCC's construction of the statute (to remedy the ambiguity) is reasonable. In deciding this question, we "may not substitute [our] own construction of [the] statutory provision for a reasonable interpretation made by the" FCC. Chevron, 467 U.S. at 844.

Because the approval requirement imposed by Congress in § 222 is fairly rigorous in that it requires customer knowledge and exercise of discretion after knowledge, the methods available for obtaining such approval were obviously limited. Indeed, the CPNI Order indicates interested parties proposed only three possible methods for obtaining approval: (1) requiring express written approval, (2) requiring express written, oral, or electronic approval (the opt-in method), or (3) requiring only implied approval by allowing carriers to notify customers of their intent to use CPNI and affording customers a mechanism to "opt-out" if they did not want their CPNI to be used (the opt-out method). After quickly disposing of the most restrictive of these three options (i.e., the method requiring express

written approval)[3], the FCC carefully weighed the advantages and disadvantages of the two remaining options, i.e., the opt-in and the opt-out approaches. CPNI Order at 67-85. Ultimately, the FCC concluded the opt-in approach was best suited to forwarding the purpose of the statute:

> We conclude . . . that an express approval mechanism is the best means to implement [§ 222's approval requirement] because it will minimize any unwanted or unknowing disclosure of CPNI. In addition, such a mechanism will limit the potential for untoward competitive advantages by incumbent carriers. Our conclusion is guided by the natural, common sense understanding of the term "approval," which we believe generally connotes an informed and deliberate response. An express approval best ensures such a knowing response. In contrast, under an opt-out approach, . . . because customers may not read their CPNI notices, there is no assurance that any implied consent would be truly informed. We agree with the observations of MCI and Sprint that, insofar as customers may not actually consider CPNI notices under a notice and opt-out approach, they may be unaware of the privacy protections afforded by section 222, and may not understand that they must take affirmative steps to restrict access to sensitive information. We therefore find it difficult to construe a customer's failure to respond to a notice as constituting an informed approval of its contents. Accordingly, we adopt a mechanism of express approval because we find that it is the best means at this time to achieve the goal of ensuring informed customer approval.

Id. at 70-71.

After reviewing the CPNI Order and the administrative record, I am convinced the FCC's interpretation of § 222, more specifically its selection of the

---

[3] See CPNI Order at 87 ("Given that nothing in section 222(c)(1) expressly limits approval to only written means, we conclude that carriers should be given flexibility to secure approval through written, oral or electronic methods.").

opt-in method for obtaining customer approval, is entirely reasonable. Indeed, the CPNI Order makes a strong case that, of the two options seriously considered by the FCC, the opt-in method is the only one that legitimately forwards Congress' goal of ensuring that customers give informed consent for use of their individually identifiable CPNI. Accordingly, in applying the rubric set forth in Chevron, and barring any serious constitutional problems posed by the CPNI Order, we must defer to the FCC's selection of the opt-in method in resolving the statutory ambiguity presented in this case.

III.

Having concluded the CPNI Order is worthy of deference under the standards outlined in Chevron, I now turn to the constitutional challenges asserted by US West. See Rust v. Sullivan, 500 U.S. 173, 190 (1991) (reviewing challenged regulation under Chevron standards before addressing plaintiff's constitutional challenges). It is true that courts need not defer to an agency's interpretation of a federal statute if that interpretation raises serious constitutional questions. See DeBartolo Corp. v. Florida Gulf Coast Bldg. and Const. Trades Council, 485 U.S. 568, 574 (1988) (although NLRB's interpretation of NLRA was normally entitled to deference, Court refused to defer in this instance because the NLRB's interpretation raised serious First Amendment issues). This canon of statutory construction, however, is not applied in every case where an agency

interpretation is challenged on constitutional grounds.  Rather, "courts [should] scrutinize constitutional objections to a particular agency interpretation skeptically," and "[o]nly if the agency's proffered interpretation raises *serious* constitutional concerns [should] a court refuse to defer under <u>Chevron</u>."  <u>Williams v. Babbitt</u>, 115 F.3d 657, 662 (9th Cir. 1997) (italics in original), <u>cert. denied</u>, 118 S.Ct. 1795 (1998); <u>see</u> <u>Rust</u> 500 U.S. at 191-92 (although regulations were challenged on constitutional grounds, Court granted <u>Chevron</u> deference to regulations and addressed constitutional question on the merits); <u>Republican Nat'l Comm. v. Federal Election Comm'n</u>, 76 F.3d 400, 409 (D.C.Cir. 1996) (court applied <u>Chevron</u> deference because it was able to "easily resolve . . . First Amendment challenges [to the regulation] through the application of controlling precedent").  In short, "constitutional narrowing should displace <u>Chevron</u> only when the constitutional problems are truly 'grave' and never when it would effectively preclude all policy options because all possible interpretations raise constitutional problems."  <u>Williams</u>, 115 F.3d at 663.

For the reasons that follow, I conclude neither of the constitutional challenges asserted by US West is serious enough to warrant abandoning the traditional deference we grant agency interpretations under <u>Chevron</u>.

*First Amendment challenge*

US West contends the CPNI Order "violates the First Amendment by requiring that carriers secure prior affirmative consents from customers before using individually-identifiable customer information to speak with their customers on an individualized basis about services beyond the 'categories' of telecommunications services to which they currently subscribe." US West's Opening Brief at 22. In other words, US West suggests the CPNI Order unduly limits its ability to engage in commercial speech with its existing customers regarding new products and services it may offer. US West also claims the CPNI Order "restricts the ability of carriers to share and use CPNI internally–to have different divisions, affiliates, and personnel within the same carrier communicate information to each other (i.e., to speak to each other), absent a prior affirmative consent from the customer." Id.

The problem with US West's arguments is they are more appropriately aimed at the restrictions and requirements outlined in § 222 rather than the approval method adopted in the CPNI Order. As outlined above, it is the statute, not the CPNI Order, that prohibits a carrier from using, disclosing, or permitting access to individually identifiable CPNI without first obtaining informed consent from its customers. Yet US West has not challenged the constitutionality of § 222, and this is not the proper forum for addressing such a challenge even if it

was raised.[4]  Thus, we must assume the restrictions and requirements outlined in the statute are constitutional.  More specifically, we must assume the statute's restrictions on the use of CPNI, and its requirement that a carrier obtain customer approval prior to using, disclosing, or permitting access to individually identifiable CPNI, do not violate the First Amendment.

Focusing strictly, then, on the portion of the CPNI Order challenged by US West, I find nothing that warrants First Amendment scrutiny.  As previously noted, the portion of the CPNI Order at issue in this case simply adopts from an extremely limited range of choices the particular method a carrier must use in obtaining customer approval.  In my view, nothing about this selection method, viewed alone, impacts expressive activity.  At bottom, the CPNI Order narrowly impacts a carrier's nonexpressive activity by requiring it to obtain express, rather than implied, customer approval.  The CPNI Order does not, however, directly impact a carrier's expressive activity (by, for example, limiting the manner in which a carrier can speak), nor does it indirectly impact a carrier's expressive activity in such a manner as to warrant First Amendment scrutiny.  See generally Arcara v. Cloud Books, Inc., 478 U.S. 697, 702-07 (1986) (discussing when First

_____

[4] I have found no authority that would allow us, in the context of reviewing the CPNI Order, to pass on the constitutionality of § 222.  Indeed, the most this court can do is strike the CPNI Order, which would have no effect on the continued validity of the statute.

Amendment scrutiny will and will not be applied to a statute).

Although the majority attempts to explain how the CPNI Order impacts US West's free speech rights, its analysis is frustratingly vague.[5]  Indeed, the majority's discussion of this critical point contains no reference to the opt-in method selected by the FCC in the CPNI Order.  Instead, the majority strays from the narrow scope of the CPNI Order and effectively takes into account the statutory restrictions on CPNI usage.  Unfortunately, this error permeates not only the majority's threshold analysis of whether the CPNI Order implicates US West's free speech rights, but its subsequent First Amendment analysis as well.[6]

In order to highlight the deficiencies in the majority's First Amendment analysis, I will assume, for purposes of argument only, that the CPNI Order impacts a carrier's free speech rights in a manner sufficient to warrant First Amendment scrutiny.  I will also accept, for purposes of the following

---

[5]  Although the majority cites <u>Florida Bar v. Went For It, Inc.</u>, 515 U.S. 618 (1995) in support of its limited analysis, that case is quite different from the instant action.  At issue in <u>Went For It</u> was a Florida Bar rule that restricted attorneys' use of direct mail advertisements; in other words, a rule that directly impacted attorneys' commercial speech.  Here, in contrast, the CPNI Order does not directly affect any form of expressive activity engaged in by US West or other telecommunications carriers.

[6]  It is difficult to tell from the majority's opinion where its analysis of the CPNI Order ends and its analysis of the statute begins.  For much of the opinion, the majority appears to be reviewing the constitutionality of § 222 rather than the CPNI Order.

discussion, the majority's conclusions that the speech affected by the CPNI Order is commercial speech subject to First Amendment analysis under the test outlined in <u>Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n</u>, 447 U.S. 557 (1980). As noted by the majority, protected commercial speech (i.e., commercial speech that is neither misleading nor unlawful) may be regulated only if "the government can show that (1) it has a substantial state interest in regulating the speech, (2) the regulation directly and materially advances that interest, and (3) the regulation is no more extensive than necessary to serve the interest." <u>Revo v. Disciplinary Bd. of the Supreme Ct. of New Mexico</u>, 106 F.3d 929, 932 (10th Cir.) (outlining <u>Central Hudson</u> test).

A review of § 222 indicates Congress had a two-fold interest in regulating the disclosure of CPNI: the protection of consumer privacy and the promotion of fair competition among telecommunications carriers. In my view, Supreme Court and circuit precedent clearly supports the conclusion that both of these interests are "substantial" for First Amendment purposes. <u>See</u>, <u>e.g.</u>, <u>Turner Broadcasting System, Inc. v. FCC</u>, 117 S.Ct. 1174, 1186 (1997) (concluding federal government had substantial interest in promoting fair competition in market for television programming); <u>Went For It</u>, 515 U.S. at 624-25 (concluding Florida Bar Association had substantial interest in protecting privacy of personal injury victims by prohibiting invasive and unsolicited contact by lawyers); <u>Van Bergen</u>

v. State of Minnesota, 59 F.3d 1541, 1555 (8th Cir. 1995) (concluding government had substantial interest, motivated by protecting consumer privacy, in limiting use of unsolicited sales calls by auto-dialing/announcing devices); Lanphere & Urbaniak v. State of Colorado, 21 F.3d 1508, 1514-15 (10th Cir. 1994) (concluding government had substantial interest in protecting privacy of persons charged with misdemeanor traffic offenses and DUI); Curtis v. Thompson, 840 F.2d 1291, 1300 (7th Cir. 1988) ("When the fundamental right to privacy clashes with the right of free expression, the interest in privacy does not play second fiddle when the speech is merely intended to propose a commercial transaction.").

Although the majority ultimately accepts Congress' interest in protecting customer privacy, it does so only after disparaging that interest and offering its own views concerning the advantages and disadvantages of protecting the privacy of consumer information. "Judges are not experts in the field [being regulated], and are not part of either political branch of the Government." Chevron, 467 U.S. at 865. The majority also criticizes the FCC for failing to offer "a more empirical explanation and justification" for the privacy interest. Majority Opinion at 21. The problem with this criticism is that, once again, the majority ignores the procedural context of this case. The privacy interest did not originate with the FCC or the CPNI Order; rather, it originated with Congress when it enacted the

restrictions outlined in § 222. Precisely how the FCC could have or, for that matter, why it would have included in the administrative record "more empirical explanation and justification" for an interest that originated with Congress, and thus predated the administrative process in this case, is unclear.[7] As an administrative agency, and not an independent branch of government, the FCC was obligated to implement without question Congress' directive to require some form of customer approval.

Even more disturbingly, the majority rejects outright any Congressional interest in promoting competition. Although I agree protection of customer privacy is perhaps the dominant purpose of § 222, it is impossible to ignore the fact that § 222 was enacted as part of the Telecommunications Act of 1996, the entire purpose of which was "[t]o promote competition . . . in order to secure lower prices and higher quality services for American telecommunications consumers." Pub. L. No. 104-104, 110 Stat. 56, 56 (1996); see In re Graven, 936 F.2d 378, 385 (8th Cir. 1991) (when interpreting statute, court looks not only to

---

[7] The majority holding presents a serious dilemma for the FCC. Because US West has not challenged the constitutionality of § 222, carriers remain statutorily bound to obtain customer "approval" prior to using, disclosing, or granting access to individually identifiable CPNI. Further, the question of how this approval is to be obtained remains open. Thus, it would seem that, in light of the majority's opinion, the FCC must again attempt to formulate a method for obtaining such approval. It is unclear whether the FCC will now effectively be bound to adopt the opt-out method advocated by US West and the majority.

its express language, but also to overall purpose of act of which it is a part).

Indeed, the notion that promotion of competition was one of Congress' purposes in enacting § 222 is entirely consistent with the plain language of the statute itself. By restricting carriers' usage of CPNI, § 222 helps diminish anticompetitive barriers in the telecommunications market by requiring carriers (both large and small) to rely on methods other than analysis of existing CPNI to promote their products, and thereby reduces the possibility that a carrier will easily convert its existing customers for a particular product or service into customers for its new products or services.

Turning to the next prong of Central Hudson, I conclude the restrictions outlined in § 222 directly and materially advance Congress' twin interests of protecting customer privacy and promoting competition. By preventing a carrier from using, disclosing, or permitting access to individually identifiable CPNI without customer approval, § 222 directly promotes the goal of protecting customer privacy. Indeed, § 222 arguably promotes the First Amendment rights of consumers by allowing them to call whom they wish when they wish without fear that their calling records will be disclosed to others. Likewise, § 222's limitations on the use of CPNI appear to promote competition by "leveling the playing field" among carriers offering new types of telecommunications markets. For example, § 222 makes it more difficult for a large long-distance carrier (such

- 15 -

as AT&T) to develop an immediate monopoly in a new telecommunications market (e.g., PCS) by limiting its use of CPNI obtained from its long-distance customers.

In addressing this prong of Central Hudson, the majority once again ignores the procedural context of the case and criticizes the FCC for "present[ing] no evidence showing the harm to either privacy or competition is real." Majority Opinion at 25. As stated above, because the two interests originated with Congress and thus predated the administrative process that led to the issuance of the CPNI Order, it is unclear precisely what the majority believes the FCC should have done to bolster the administrative record. Indeed, I submit it was wholly unnecessary for the FCC to collect or consider any evidence regarding these two Congressional interests. Instead, the FCC's much more narrow responsibility, which I believe it reasonably fulfilled, was to fill in the gaps left by Congress when it enacted § 222.

Finally, I turn to the last prong of Central Hudson, which asks whether the restrictions at issue are narrowly tailored to achieving the government's interests. In Board of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989), the Supreme Court emphasized the "fit" between the restrictions and the governmental interests need not be "necessarily perfect, but reasonable." In other words, the restrictions do not have to represent "the single best disposition but

one whose scope is in proportion to the interest served." Id. Before addressing the CPNI Order, I again note US West has not challenged § 222, and has thus effectively conceded the requirement of customer approval is narrowly tailored to achieving the interests of privacy and competition. As for the CPNI Order itself, I am convinced it is also narrowly tailored to achieving these same interests. The administrative record convincingly demonstrates that, of the limited options available to the FCC, the opt-in method of obtaining customer approval was the most reasonable solution. As the FCC concluded in the CPNI Order, the method of implied approval suggested by US West (i.e., the opt-out method) did not ensure that the Congressional goal of informed customer consent would be satisfied. As for the two express methods of approval available to it, the FCC chose the least restrictive method available. More specifically, the FCC rejected the express written approval method as too restrictive, and adopted the opt-in method which allows carriers to obtain express written, oral, or electronic approval from customers. Ultimately, I conclude the FCC's selection satisfies the last Central Hudson prong because it represents a "carefu[l] calculat[ion of] the costs and benefits associated with the burden on speech imposed by its prohibition." Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 417 (1993) (internal quotation marks omitted).

The majority, focusing at this point on the CPNI Order rather than the

statute, concludes the FCC failed to adequately consider the opt-out method, which the majority characterizes as "an obvious and substantially less restrictive alternative" than the opt-in method. Majority Opinion at 29. Notably, however, the majority fails to explain why, in its view, the opt-out method is substantially less restrictive. Presumably, the majority is relying on the fact that the opt-out method typically results in a higher "approval" rate than the opt-in method. Were mere "approval" percentages the only factor relevant to our discussion, the majority would perhaps be correct. As the FCC persuasively concluded in the CPNI Order, however, the opt-out method simply does not comply with § 222's requirement of informed consent. In particular, the opt-out method, unlike the opt-in method, does not guarantee that a customer will make an informed decision about usage of his or her individually identifiable CPNI. To the contrary, the opt-out method creates the very real possibility of "uninformed" customer approval. In the end, I reiterate my point that the opt-in method selected by the FCC is the only method of obtaining approval that serves the governmental interests at issue while simultaneously complying with the express requirement of the statute (i.e., obtaining informed customer consent).

In summary, as US West has not challenged the constitutionality of § 222, there is no need to subject the CPNI Order to First Amendment scrutiny. Even assuming, arguendo, such scrutiny is required, I conclude the CPNI Order does

not violate US West's First Amendment rights. In my view, US West has not posed a "grave" First Amendment challenge to the CPNI Order.

*Fifth Amendment challenge*

US West also contends the FCC's restrictions on the disclosure of CPNI are so severe they constitute a regulatory taking of property without just compensation, in violation of the Takings Clause of the Fifth Amendment. As with its First Amendment claim, US West is again, in my view, aiming at the statutory restrictions rather than the narrow portion of the CPNI Order at issue in this case. Even assuming, for purposes of argument, that US West's "takings" argument is focused solely on the CPNI Order, I find no merit to it.[8]

The Fifth Amendment provides, in pertinent part: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. "The purpose of the Fifth Amendment is to prevent the '[g]overnment from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" 767 Third Avenue Assoc. v. United States, 48 F.3d 1575, 1580 (Fed.Cir. 1995) (quoting Penn Central Transp.

---

[8] I find US West's takings claim inconsistent with its First Amendment claim. In particular, the more accessible CPNI is to various employees within the company, the less likely it is that CPNI will be deemed a trade secret and thereby be entitled to protection under the Fifth Amendment's Taking Clause. Moreover, if CPNI is disclosed to outside companies, it would clearly lose any protection as a trade secret and would not be considered property protectable under the Fifth Amendment.

Co. v. New York City, 438 U.S. 104, 123 (1978)).

In addressing US West's takings argument, the threshold question is whether CPNI constitutes "property" for purposes of the Takings Clause. US West gives short shrift to this issue, arguing the decision in Ruckelshaus v. Monsanto Co., 467 U.S. 986 (1984), establishes that CPNI is protectable property for purposes of the Takings Clause. In Monsanto, plaintiff Monsanto, a pesticide manufacturer doing business in Missouri, filed suit challenging certain amendments to the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136 et seq., requiring it to disclose to the EPA various health, environmental, and safety data related to its products. In addressing Monsanto's assertion that the challenged regulations constituted a takings under the Fifth Amendment, the Court held "that to the extent that Monsanto ha[d] an interest in its health, safety, and environmental data cognizable as a trade secret property right under Missouri law, that property right [wa]s protected by the Taking Clause of the Fifth Amendment." 467 U.S. at 1003-04.

Although Monsanto certainly sets the stage for treatment of CPNI as property for Fifth Amendment purposes, US West has failed to take the requisite step of demonstrating that CPNI qualifies as trade secret property, or any other kind of protectable property interest, under state law. Therefore, there is no basis for concluding US West has presented a "grave" or "serious" Fifth Amendment

- 20 -

challenge to the CPNI Order.

IV.

In conclusion, I view US West's petition for review as little more than a run-of-the-mill attack on an agency order "clothed by ingenious argument in the garb" of First and Fifth Amendment issues. Zemel v. Rusk, 381 U.S. 1, 16-17 (1965). Because there is no merit to those constitutional arguments, and because the FCC's CPNI Order is an entirely reasonable interpretation of 47 U.S.C. § 222, I would deny US West's petition for review and affirm the CPNI Order.